THE UNION PACIFIC RAILWAY COMPANY v. DAVID SCHWENCK.

**Railroads:** DAMAGE TO STOCK: FENCING. The farm of S. was bisected by the line of the railroad. The company fenced its line, as required by the act of June 22, 1867. S. used the railroad fence on the south side of the road as the north fence of his enclosed pasture and corral. The corral consisted of about three acres, into which in the evening of the night in question he turned his twenty-three head of cattle. At the same time he looked along the line of the railroad fence part of the enclosure, and it was all up and apparently in good condition. In the

morning a board was found broken off of this part of the fence, by means of which three of the cattle had escaped— gone on to the railroad track, where two of them had been killed and the other crippled by a passing train. The testimony as to the condition of the fence, as to its soundness, was conflicting, some witnesses swearing that it was rotten, others that it was sound. Verdict and judgment for S. On error, *Held,* That S. was not guilty of contributory negligence, and the finding and judgment upheld.

ERROR to the district court for Sarpy county. Tried below before SAVAGE, J.

*A. J. Poppleton* and *J. M. Thurston,* for plaintiff in error, cited: *Tonawanda R. R. v. Munger,* 5 Denio, 259. *C. & N. W. R. R. v. Goss,* 17 Wis., 428. *Trow v. Vermont Central,* 24 Vt., 487. *Central Branch R. R. v. Lee,* 20 Kan., 353.

*Burnham & Ballet,* for defendant in error, cited: *Corwin v. New York & Erie R. R.,* 3 Kern., 42. *Jefferson v. Applegate,* 10 Ind., 49. *Indianapolis v. Hughes,* 10 Ind., 502. *Rogers v. Newburyport,* 1 Allen, 16.

COBB, J.

Sec. 1 of the act of 1867, entitled "An act to define the duties and liabilities of railroad companies," provides that: " Every railroad corporation    *    *    *    shall erect and thereafter maintain fences on the sides of their said railroad    *    *    *    suitably and amply sufficient to prevent cattle, horses, sheep, and hogs from getting on the said railroad, except at the crossings of public roads and highways, and within the limits of towns, cities, or villages,    *    *    *    and so long as such fences    *    *    *    shall not be made after the time hereinbefore prescribed for making the same, shall have elapsed, and when such fences    *    *    *    or any part thereof are not in sufficiently good repair to ac-

complish the object for which the same, as herein pre-
scribed, was intended, such railroad corporation and its
agents shall be liable for any and all damages which shall
be done by the agents, engines, or trains of any such cor-
poration, or by the locomotives, engines, or trains of any
other corporation permitted and running over or upon
their said railroad, to any cattle, horses, sheep, or hogs
thereon; and when such fences and guards shall have been
fully and duly made, and shall have been kept in good
and sufficient repair, such railroad corporation shall not
be liable for any such damages unless negligently and
willfully done." Comp. Stat., 381.

The testimony shows that the railroad of the plaintiff
in error runs through the farm of the defendant in error
dividing it into two nearly equal parts east and west. The
pasture of the defendant in error is on the south side of
the railroad. That some twelve or thirteen years be-
fore the killing of the stock in question the railroad
company fenced the line of road at this place with a good
fence consisting of posts set eight feet apart and three
boards sixteen feet in length. This fence on the south side
of the railroad constituted the north fence of the pas-
ture in which the defendant in error kept his cattle in the
day time, and he had fenced off a corral of about three
acres, for one line of which fence he used the railroad
fence. The evening before the accident the defendant in
error put his cattle, consisting of twenty-three head, into
this corral, as was his custom, and looked along the rail-
road part of the fence, and it was apparently all right. In
the morning the railroad fence between the cattle and the
railroad track was broken, i. e., the middle board broken
off, three of the cattle had passed through and on to the
railroad track, where by a passing train two of them were
killed and one crippled.

We think that the case turns on the question, did the
railroad company at this point "erect and thereafter main-

tain fences      *       *       *       suitable and amply suffi-
cient to prevent cattle       *       *       *       from getting
on the said railroad?"    We will not say that the fact that
the fence erected by the railroad company did not on this
occasion prevent cattle from getting on the railroad track
is a conclusive answer to this question.    But in addition to
the admitted fact of the said fence having proved as against
these cattle at this time unsuitable and insufficient, there
was testimony on both sides, and we think that by the in-
structions of the court the point was fairly submitted to
the jury.

The court instructed the jury as follows: "1. The statute
applicable to this case requires every railroad corporation
to erect and maintain fences on the sides of their railroad
suitable and amply sufficient to prevent cattle from getting
on the track of said railroad.

" 2. If you find that in this case the fence on the north
side of what the plaintiff calls his corral was of such a
character as described in the last paragraph, then you should
find for the defendant.

"3. But if you find that the stock in question were
killed by engines or cars of the defendant, and that said
stock came on said track by reason of any imperfection in,
or insufficiency of said fence, then the plaintiff would be
entitled to recover."

The point upon which there was any difference in the
testimony was as to the condition which the fence was in
at the time of the killing.    Plaintiff, who was sworn in
his own behalf, testified as follows upon that point on his
cross examination:

Q.   Do you know what condition the fence was in?

A.   Yes.   At the time I closed it at night, it was all
right.   I looked along the railroad, and the fence was all
up that very evening I put the cattle in.

On his re-direct examination, he said: "There was three
boards up.   It was all up.   It was nailed on, and there

was no boards broken down. I examined the condition of the board that was broken down. It was rotten. There was no posts broken down or other injuries to the fence at that place. Along the line they were pretty near all burned off. A good many only have one inch or two inches to hold the post burned off by prairie fires. The cattle had broken through that fence a good many times. I notified the agent of the company, Mr. Neveman, in April. In April it was in condition to keep cattle that is in the pasture. I didn't notify the agent about the corral fence, but the fence along the pasture. Didn't notify any of the agents about the corral fence. It was a middling good fence. It was all rotten. They never broke through the corral fence before."

George Gudhardt, sworn on the part of the plaintiff, stated as follows: "My business is farming. Live three-quarters of a mile from Papillion, near Mr. Schwenck's farm. I pass his pasture two or three times a week. Lived there thirteen years."

Q. What was the condition of the plaintiff's corral fence on the 18th July, 1881?

A. I think the fence is not so they can keep cattle in. There is a good deal of posts and boards burned off. I have been there thirteen years, and that fence has been there. The posts and boards are rotten. It is not a safe fence to keep cattle. Have measured the fence. It is forty-six inches. The lowest place from the bottom board is twenty-three inches.

On the contrary Edward Nolan, sworn on the part of the defense, testified as follows: "My business is section foreman, and was on the 18th July last  *   *   *  I know where Mr. Schwenck's corral was, it was alongside of the track. Track was right close to the corral. I found the center board of the three boards was broken right close to the post. It was broken off from the post and laid on the ground. The other end of the board was fastened to the

post.   Only one board broken.   My business in respect to
the fence was to see that it was all right and to keep it up.
It was in good condition, a three board fence.   I always
paid attention to it and kept it in good repair.   I knew
that it was a corral.   The cattle never broke out of that
particular place, but out of the pasture.   I notified Mr.
Schwenck of that many times.   The corral was about forty
rods from where he had his cross fence.   The fence was
constructed of good sound boards, six inch boards, sixteen
feet long.   The posts were eight feet apart.   There were
no posts burned in that forty rods of fence.   There might
have been further along."

On the cross examination he said : "I have six miles of
fence to look after.   I am prepared to state that every board
in that six miles of fence is good.   I know them every sin-
gle board.   That is my business to examine them.   They
were sound last July.   Whether a board will rot in eight
months will depend on how sound they were.   Do not
take them off every eight months.   I don't believe they
are rotten to-day.   I wouldn't believe it if a party should
say so.   Am in the employ of the company, and would
lose my position if the fences were not properly kept up."

Here is a pretty sharp conflict of testimony, and thus a
case is presented peculiarly within the province of a jury.

But upon the trial the defendant requested the court to
instruct the jury as follows :   "The law requires a railroad
to fence its line of road against cattle running at large and
against no other.   It also requires the plaintiff to enclose his
cattle, and not permit them to run at large in the night time.
If you find that the plaintiff's cattle escaped from his en-
closure and strayed upon the track of the defendant, and
were killed in the night time, the defendant will not be lia-
ble," which was refused.

There was no error in the refusal to give this instruction
upon the evidence in the case.   It is true the law provides
that : "No cattle   *   *   *   shall run at large during the

night time between sunset and sunrise * * * and the owner or owners of any such animal shall be liable in an action for damages done during the night time." In so far as these cattle were running at large in the night time, it was through no fault or want of care and diligence on the part of the defendant in error, but through the fact that the fence erected by plaintiff in error, and which it was required by statute to keep in sufficiently good repair to accomplish the objects for which the same as by statute required were intended, was not so kept. Let the case be supposed that these cattle, after escaping through the fence, instead of getting on the railroad track and being killed, had gone to the corn crib or hay stacks of the plaintiff in error, and there committed damage, and an action been brought by the plaintiff in error against the defendant in error for such damage, can there be any doubt that an answer and proof, that said cattle had escaped and become at large at the time of committing such damage through the fault or illegal act of the plaintiff in such action, would be a complete defense?

It is not claimed, nor can it be, that the defendant in error was guilty of any contributory negligence. So far as it appears to the contrary by proof, citation, or suggestion, he had the right to treat the railroad fence as a division fence, with the duty of keeping it in repair imposed solely upon the railroad company by statute. He therefore had a right to use his enclosure, one string of the fence of which was the railroad fence, for all legitimate purposes of agriculture, of which the raising, breeding, and keeping of cattle constitute an important part in this state. If the defendant in error put an improper number of cattle into his inclosure for its size, so that by reason of its crowded condition a stronger fence was required to keep the cattle in than is required for an ordinary pasture, that might possibly be considered contributory negligence. But neither by proof nor instruction prayed is that point presented in this case.

The case at bar differs from nearly or quite all of the cases cited by counsel for plaintiff in error in their brief in this, that in all of them the animals have either been permitted purposely, by those having charge of them, to be and run at large, contrary to statute or regulations, or have escaped from the control of their keepers through causes for which the railroad company was in no wise responsible. This may be said of the case of *Central Branch Railroad Co. v. Lea*, 20 Kan., 353, and most of the numerous cases there cited, as well as the Wisconsin cases.

As to the question suggested by the instruction prayed for by plaintiff in error, and stated in the second paragraph of its brief, that a fence, although "suitable and sufficient to prevent cattle  *  *  *  from getting on the railroad" in the day time, it might not be sufficient for that purpose in the night, if it be true that it requires a stronger fence to guard against the depredations of domestic animals in the night than in the day time, it was a question for the jury, and had there been testimony before them to warrant it, we must presume that it would have had its proper weight in shaping their verdict.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.